**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SHERI MCEACHERN-ANTHONY,<br><br>Plaintiff,<br><br>v.<br><br>ATLANTA INDEPENDENT SCHOOL SYSTEM d/b/a ATLANTA PUBLIC SCHOOLS,<br><br>Defendant. | Civil Action File No.<br><br>____________________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

Plaintiff, Sheri McEachern-Anthony, ("Plaintiff" or "McEachern-Anthony") files this Complaint for Equitable Relief and Damages against Defendant Atlanta Independent School System d/b/a Atlanta Public Schools ("APS" or "Defendant") showing the Court the following:

## INTRODUCTION

1. This is an action based on sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, *et seq.*, "Title VII").

2. Plaintiff seeks injunctive and declaratory relief, back pay and lost benefits, front pay, compensatory damages, and attorney's fees and costs of litigation.

## PARTIES, JURISDICTION, AND VENUE

3. McEachern-Anthony is a citizen of the United States and a resident of the State of Georgia and submits herself to the personal jurisdiction of this Court.

4. McEachern-Anthony is a woman.

5. At all times relevant to this suit, McEachern-Anthony was APS's "employee," as that term is defined by Title VII.

6. APS is a school district that manages and controls the public schools in Atlanta, Georgia, which lies within the jurisdiction of this Court.

7. Service of process may be affected on APS through its superintendent, Dr. Bryan Johnson, at APS's principal office: 130 Trinity Avenue, SW, Atlanta, Georgia 30303.

8. APS is subject to the personal jurisdiction of this Court.

9. At all times relevant to this suit, APS has been a covered employer under Title VII because it engages in commerce or in an industry affecting commerce and has had more than 15 employees for each working day in each of 20 weeks in the current or preceding calendar year.

10. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

11. Venue is proper in this district and division under 28 U.S.C. § 1391 because the acts, events, and occurrences giving rise to Plaintiff's claims took place in Atlanta, Georgia, which is within this Court's judicial district and division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. On or about March 3, 2021, McEachern-Anthony filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), Charge No. 410-2021-03222, alleging continuing sexual harassment and retaliation.

13. On December 17, 2025, the EEOC issued a Notice of Right to Sue to McEachern-Anthony based on Charge No. 410-2021-03222.

14. McEachern-Anthony brings this suit within ninety (90) days of receipt of her Notice of Right to Sue.

15. McEachern-Anthony has exhausted her administrative prerequisites for filing this lawsuit.

## STATEMENT OF FACTS

### *Mr. Portee sexually assaults Ms. McEachern-Anthony.*

16. McEachern-Anthony began working for APS in 2002.

17. In 2018, McEachern-Anthony was APS's District Elementary Social Studies Coordinator and an instructor for an after-school "All-Stars" program at APS's Sylvan Hills Middle School ("Sylvan Hills").

18. The Principal of Sylvan Hills at the time was Mr. Artesza Portee.

19. In the Spring of 2018, while McEachern-Anthony was working as an instructor at Sylvan Hills, Portee asked her to stop by his office.

20. Once in his office, Portee told McEachern-Anthony "I've really been wanting you for a long time" and pressed her against a wall. Portee leaned down, kissed her, and started touching her breasts, exposing them. When McEachern-Anthony tried to stop Portee, he asked her, "what [was] wrong?"

21. McEachern-Anthony did not respond to Portee and immediately left Portee's office, hoping not to see anyone as she adjusted her clothing while walking down the hallway to the media center.

22. That same night, McEachern-Anthony also told Dr. Tiffany Franklin, the All-Stars program director, that "her boy did too much," to which Franklin responded: "that's why I am glad I'm fat."

23. Later than night, McEachern-Anthony also called APS's K-5 Social Studies Coordinator, Katheryn Nails, and told her about Portee's sexual assault.

24. As a result of Portee's sexual assault, McEachern-Anthony discontinued assisting with the All-Stars program.

***APS was aware of Mr. Portee's multiple sexual assaults against APS Employees and promoted him anyway.***

25. In August 2019, McEachern-Anthony began working as an Assistant Principal at APS's Frederick Douglass High School ("Douglass").

26. In March 2020, APS began the process of promoting Portee to be the Principal of Douglass.

27. On March 31, 2020, APS's Board Member Leslie Grant ("Grant"), after learning that APS intended to promote Portee, sent an email to the superintendent raising concerns regarding several "stories" she had heard over the years with respect to Portee's interactions with women.

28. Upon receiving Grant's email, APS hired the law firm of Greenberg Traurig, LLP ("GT") to conduct a supposedly "independent investigation" of Portee.

29. Leslie Grant, an APS Board Member who does not participate in day-to-day operations of APS, was the only witness interviewed by GT.

30. Not surprisingly, GT concluded that it could not "evaluate the veracity of the allegations" made by Board Member Leslie Grant and that the "concern raised by Grant does not warrant any further investigation into Portee at this time."

31. On June 9, 2020, GT issued a "Supplemental Report – Evaluation of Additional Allegations Against Artesza Portee" in which it stated:

> …on May 5, 2020, Chris Brown ("Brown"), an Atlanta community member, emailed APS representative Aretta Baldon ("Baldon") to follow-up on concerns he previously raised regarding the impending appointment of Portee as the principal of Douglass High School ("Douglass"). Brown noted that he voiced his concerns at a previously held virtual meeting with Baldon. *See* May 5, 2020 Email Regarding "Douglass High" attached at Tab B. In the follow-up email, Brown raised qualification concerns with regard to Portee and also raised allegations that Portee had a history of sexual harassment, including an incident involving a current employee of Douglass. Brown alleged that since Portee would directly supervise this employee, the employee would possibly have to leave the school for fear of retaliation and to avoid contact with Portee. Brown explained that he also vocalized his concerns at a community meeting where the Douglass High School Go Team and the deputy superintendent were present. *Id*. As a result, APS requested that GT re-open its investigation regarding the additional sexual harassment allegations raised by Brown.

32. On June 4, 2020, attorneys from GT interviewed Portee, who "denied any history of sexual misconduct."

33. Apparently based on Portee's denials alone, GT concluded in its June 9, 2020, supplemental report that "alleged sexual harassment by Portee do not warrant any further investigation at this time. . .".

34. For several years and, at least from 2018, APS and its administrators were aware that Portee had engaged in numerous sexual assaults, sexual harassment and other violations of Title VII and have not only deliberately failed to take prompt and effective remedial action, but actually facilitated Portee's violations of Title VII

by promoting and transferring him or by terminating individuals who attempted to complain about Portee's misconduct.

35. From at least from 2018 until the present day, APS failed to:

a. Appropriately discipline Portee;

b. Investigate complaints raised by students and employees regarding sexual harassment, physical abuse, or inappropriate contact by Portee;

c. Protect employees like McEachern-Anthony and others from sexual harassment, physical abuse or inappropriate contact by Portee;

d. Adequately supervise Portee despite knowing he posed a substantial risk of harm to others; and

e. Institute reasonable corrective measures aimed at preventing Portee from sexually assaulting employees such as McEachern-Anthony.

***Ms. McEachern-Anthony complains about Mr. Portee's sexual assault.***

36. On June 12, 2020, Skye Duckett, APS's Chief Human Resources Officer and a friend of Portee's, telephoned McEachern-Anthony, who was then working as an Assistant Principal at Douglass.

37. During the call, Duckett stated that it had come to her attention that Portee and McEachern-Anthony were friends outside of work and that their friendship could become problematic given the new supervisor/subordinate

relationship between the two with Portee serving as Principal, and McEachern-Anthony serving as an Assistant Principal at Douglass.

38. Duckett advised McEachern-Anthony that Portee was named Principal at Douglass to turn the school around and would likely be hard-nosed, given a lot of leeway to effectuate change, and that McEachern-Anthony would be expected to carry out Portee's directives in a professional manner.

39. McEachern-Anthony responded that she was not friends with Portee but would have no problems following Portee's directives or the directives of any other person to whom she reported.

40. Despite McEachern-Anthony's statement that she would follow directives from Portee and higher-level management, Duckett reiterated Portee's autonomy to effectuate change at Douglass, and specifically asked that given the friendship between Portee and McEachern-Anthony and their new supervisor/subordinate relationship, if McEachern-Anthony wanted to stay at Douglass or be transferred.

41. McEachern-Anthony followed up the phone call by sending an email to Duckett reiterating that she and Portee "are not and have never been friends."

42. Upon information and belief, Portee directed Duckett to call McEachern-Anthony to encourage McEachern-Anthony to leave Douglass.

43. Between March and June 2020, Portee would regularly hold meetings with Douglass staff, wherein he would single-out McEachern-Anthony for criticism.

44. At least two other APS employees, Dr. Ellis Duncan and Dr. Tiffany Franklin, noticed Portee's conduct and expressed to McEachern-Anthony, in one way or another, that it seemed Portee wanted her gone.

45. On June 22, 2020, McEachern-Anthony filed an internal complaint (the "Internal Complaint") with George Williams, then the Executive Director of the Office of Employee Relations.

46. The Internal Complaint disclosed Portee's 2018 sexual assault and McEachern-Anthony's fear Portee would continue to target and harass her because her knowledge of his sexual misconduct was a threat to him so long as she remained at Douglass.

47. Neither Williams, nor any other administrator, acknowledged receipt of the Internal Complaint.

48. Nevertheless, the work environment became increasingly hostile.

49. Six weeks later, McEachern-Anthony contacted Williams for a status check on her complaint.

50. Williams responded that he had overlooked her complaint.

51. Despite being aware of an investigation by a law firm hired by APS into Portee's sexual misconduct and treatment of women in the past, Williams and other administrators with authority had repeatedly failed to disclose to investigators information relating to Portee's sexual misconduct and treatment of women.

52. Eventually APS retained GT *again* as independent outside counsel to investigate Portee.

53. On October 20, 2020, GT attorneys, Richard Valladares and Allyson Lumpkin conducted an in-person interview of McEachern-Anthony.

54. During the interview, McEachern-Anthony explained in detail Portee's 2018 sexual assault.

55. GT's Investigators found that McEachern-Anthony provided credible evidence that Portee had sexually assaulted her.

56. Specifically, GT's investigators found:

a. McEachern-Anthony and her corroborating witness were credible;

b. Witnesses named by McEachern-Anthony provided credible evidence to show "a history and pattern of inappropriate conduct by Portee with respect to interactions with female employees—including several allegations of inappropriate touching, attending meetings in inappropriate attire, and suggestive and/or harassing conduct or comments to female employees"; and

c. Portee's denial of the alleged sexual assault "doesn't not

appear credible”.

57. Despite GT’s findings, Portee was not fired, and was merely put on a 25-day suspension for “dishonesty.”

58. Shortly after GT’s findings, McEachern-Anthony was placed on “Special Assignment” and told she would have to leave her position as Assistant Principal at Douglass.

59. McEachern-Anthony was given the choice of: (1) being placed on administrative leave for the rest of the year, (2) being moved to the Office of High Schools for the rest of the year, or (3) some combination of the two.

60. McEachern-Anthony opted to go to the central office, where she worked in graduation recovery and was very successful.

61. On or about March 8, 2021, McEachern-Anthony filed a Charge of Discrimination with the EEOC, alleging continuing sexual harassment and retaliation.

62. Upon information and belief, APS became aware of McEachern-Anthony’s Charge of Discrimination shortly after its filing.

63. In July 2021, after the conclusion of the 2020-21 school year, McEachern-Anthony was transferred to an Assistant Principal role at the Atlanta College and Career Academy (“ACCA”), a school within the APS system.

64. ACCA is not a standalone school, but rather a career academy that students from other APS schools attend for specific, technically-oriented courses.

65. McEachern-Anthony's new supervisor at ACCA was Principal Tashara Wilson ("Wilson").

66. McEachern-Anthony's performance at ACCA during the 2021-22 school year was good.

***Portee's sexual harassment of McEachern-Anthony and APS's inaction are publicized; Portee is not terminated.***

67. On September 29, 2021, McEachern-Anthony filed a lawsuit in the U.S. District Court for the Northern District of Georgia (Civil Action File No. 1:21-cv-04037-VMC) against APS and Portee alleging that Portee's sexual assault violated the Fourteenth Amendment to the U.S. Constitution (a claim brought through 42 U.S.C. § 1983) and 20 U.S.C. § 1681, *et seq.* ("the Title IX Lawsuit").

68. That same day, the local news station WSB-TV Atlanta ("Channel 2") interviewed McEachern-Anthony about the Title IX Lawsuit, wherein McEachern-Anthony described Portee's 2018 sexual assault and APS's lackluster response to her June 22, 2020, complaint.

69. The September 29, 2021, interview was broadcast on Channel 2, exposing Portee's conduct and APS's inaction.

70. On or about October 13, 2021, after the airing of McEachern-Anthony's Channel 2 interview, students at Douglass walked out of class in protest of Portee, chanting that Portee should be "locked up."

71. That evening, Channel 2 broadcast another story about the student walkout, further highlighting Portee's misconduct and the fallout from APS's inaction.

72. Upon information and belief, Portee was permitted to resign in 2022.

73. Despite his resignation, Portee continued as a contractor of APS for at least the 2023 and 2024 school years.

***APS retaliated against Ms. McEachern-Anthony because of her protected complaints and lawsuit.***

74. In June of 2022, McEachern-Anthony received her performance review from Wilson.

75. During the performance review, Wilson told McEachern-Anthony that APS senior management either "frowned upon" or prohibited Wilson from giving level 4s to employees, but that McEachern-Anthony's performance was excellent and that but for APS's senior management's unstated policy of "frowning upon" or prohibiting giving level 4s to employees, she would have rated McEachern-Anthony a "4" in almost every category of the performance evaluation.

76. Despite this, only a few months later in September 2022, shortly after the beginning of the 2022-23 school year, Wilson summoned McEachern-Anthony to a meeting to with her and the newly-appointed Associate Superintendent, Paul Brown, to discuss alleged "performance concerns."

77. McEachern-Anthony, Wilson, and Brown met on September 19, 2022.

78. Wilson went on to outline supposed "performance issues" that, in fact, had nothing to do with McEachern-Anthony's performance, but instead related to a comment an ESOL teacher from Douglass made about an ACCA teacher's course not being "engaging."

79. Wilson implicated McEachern-Anthony in the ESOL teacher's criticism because McEachern-Anthony had invited the Douglass ESOL teacher to ACCA to support a shared student (who was enrolled at both Douglass and ACCA)—an action that was within McEachern-Anthony's responsibility to do as Assistant Principal.

80. Brown left the meeting after the questionable basis of Wilson's criticisms of McEachern-Anthony became clear, as he apparently did not want to be present for the sole purpose of exerting pressure on McEachern-Anthony.

81. On September 29, 2022, McEachern-Anthony advised Wilson and other APS officials that the meeting orchestrated by Wilson was in retaliation for McEachern-Anthony engaging in protected activity.

82. That same day McEachern-Anthony filed a formal, written complaint with APS asserting that Wilson's actions were in retaliation for McEachern-Anthony's protected activity.

83. Commencing in October 2022, Wilson repeatedly excluded McEachern-Anthony from administrator staff meetings even though McEachern-Anthony was a senior administrator at ACCA and removed McEachern-Anthony's access to the Kronos for Managers information system that is critical to functioning of administrators at APS.

84. On October 7, 2022—only a week after McEachern-Anthony filed her formal written complaint of retaliation—Wilson abruptly and without warning removed McEachern-Anthony from handling Event Planning and Marketing, a significant part of McEachern-Anthony's job duties.

85. Later in October 2022, Wilson left McEachern-Anthony out of various health initiatives that fell within McEachern-Anthony's job duties, notably Hazel Health, and reassigned those job duties to other staff members.

86. On or about November 1, 2022, Wilson again summoned McEachern-Anthony to the main office conference room. Wilson's stated purpose for summoning McEachern-Anthony was to discuss alleged performance deficiencies.

87. In fact, there were no performance deficiencies. The meeting was used by Wilson to harass McEachern-Anthony and make false statements about McEachern-Anthony's job performance.

88. Thereafter, McEachern-Anthony was subjected to intense scrutiny and harassment by Wilson. For example, when McEachern-Anthony had to obtain Wilson's approval before leaving campus to take a document to the Office of Safety and Security. Indeed, McEachern-Anthony, despite being a senior administrator with 20 years of experience, was now required to obtain permission for the smallest tasks.

89. The harassment by Wilson was so bad that McEachern-Anthony was compelled to send an email on November 7, 2022, asking for permission to perform her job. The email was entitled, "Permission to Fulfill Duties and Responsibilities."

90. On or about November 14, 2022, Wilson blamed McEachern-Anthony for a volunteer clearance mistake made by the central office and used the mistake as pretext to remove McEachern-Anthony's hiring manager and volunteer screening duties.

91. On or about January 5, 2023, Wilson again met with McEachern-Anthony about alleged "performance concerns," and later emailed McEachern-Anthony a 10+-page Performance Development Plan ("PDP") that contained numerous false allegations.

92. On or about February 17, 2023, Wilson communicated to the staff that McEachern-Anthony's job duties were temporarily reassigned due to McEachern-Anthony's absence on FMLA leave when McEachern-Anthony was returning to full time work on February 20, 2023.

93. On or about February 27, 2023, Wilson issued a replacement PDP that removed substantial verbiage and removed the emotional language and personal attacks from the first.

94. The replacement PDP was a retraction of the some of the information from the first PDP, but still contained numerous false statements.

95. The PDP effectively made McEachern-Anthony ineligible for promotion at APS and unmarketable to any other school district.

96. On February 28, 2023, Wilson communicated to the staff that McEachern-Anthony's job duties were permanently reassigned despite the fact that McEachern-Anthony was back from FMLA leave and working full time.

97. The communication to the staff was designed to humiliate McEachern-Anthony and coerce McEachern-Anthony to resign from her position at APS due to McEachern-Anthony's protected activity.

98. In March 2023, Wilson permanently took all duties and responsibilities away from McEachern-Anthony except for attendance and discipline.

99. To get away from Wilson's escalating retaliation, McEachern-Anthony sought a different position for the 2023-24 school year.

100. In July 2023, McEachern-Anthony accepted a position as a special education teacher at APS's Fred A. Toomer Elementary School ("Toomer")—a position that required her to take a pay cut of approximately $35,000.

101. The day after McEachern-Anthony signed her contract to work at Toomer, McEachern-Anthony was put on administrative leave pending an investigation for an allegedly falsifying her daughter's home address so that she could attend APS schools.

102. However, as a district-level APS employee, McEachern-Anthony's daughter was entitled to attend any APS school.

103. On or about August 28, 2024, McEachern-Anthony received APS's formal notice of its intent to terminate her employment.

104. Rather than have a termination on her record, McEachern-Anthony opted to resign in lieu of termination.

105. The Title IX Lawsuit was ultimately disposed of on APS's Motion for Judgment on the Pleadings; however, no Title VII claims were asserted in that case and it was not decided on its merits. Rather, APS's motion was based on the purely legal question of whether *employees* could bring claims under Title IX. During the pendency of the Title IX Lawsuit, the 11th Circuit Court of Appeals issued an opinion answering that question in the negative, necessitating the case's dismissal.

## COUNT I
## Sexual Harassment/Discrimination in Violation of Title VII

106. McEachern-Anthony incorporates by reference all the preceding paragraphs of the Complaint.

107. At all times relevant to this suit, APS was subject to the requirements of Title VII to not discriminate on the basis of sex.

108. APS discriminated against McEachern-Anthony on the basis of her sex when it: (1) allowed Portee to sexually harass her; (2) did not appropriately discipline Portee after McEachern-Anthony reported his sexual harassment; and (3) terminated McEachern-Anthony's employment while retaining Portee as a contractor.

109. APS's discrimination against McEachern-Anthony because of her sex in the terms and conditions of employment and termination violates the statutory provisions and protections of Title VII.

110. APS created a hostile work environment for McEachern-Anthony and exacted tangible employment actions against her.

111. Alternatively, McEachern-Anthony's sex was a motivating factor in its decision to treat Portee more favorably and terminate her employment.

112. APS's actions in discriminating against McEachern-Anthony because of her sex were committed with deliberate intent to harm McEachern-Anthony and her federally protected rights or, alternatively, with reckless disregard for her rights to be free from discrimination.

113. The effect of APS's above-mentioned conduct has been to deprive McEachern-Anthony of equal employment opportunities and benefits due to her.

114. The actions taken against McEachern-Anthony by APS have caused her to suffer both monetary and non-monetary damages.

115. As a direct and proximate result of APS's unlawful employment practices, McEachern-Anthony suffered injuries for which she is entitled to recover equitable relief and compensatory damages, including economic losses and

emotional distress, attorney's fees, and costs of litigation in an amount to be proven at trial.

**<u>COUNT II</u>**
**<u>Retaliation in Violation of Title VII</u>**

116. Plaintiff incorporates by reference all the preceding paragraphs of the Complaint.

117. At all times relevant to this suit, APS has been subject to the requirements of Title VII not to retaliate against employees who report sexual harassment.

118. McEachern-Anthony engaged in protected, oppositional activity when she: (1) filed the June 22, 2020 Internal Complaint with Williams, reporting Portee's sexual harassment and her fear of retaliation; (2) explained Portee's misconduct to GT attorneys in her October 20, 2020 interview; (3) filed her Charge of Discrimination with the EEOC, alleging sexual harassment and retaliation; and (4) filed the Title IX lawsuit against APS and Portee alleging sexual harassment.

119. Wilson's supposed dissatisfaction with McEachern-Anthony's performance only began after the widespread publication of McEachern-Anthony's Title IX lawsuit and the underlying facts—namely, of Portee's sexual misconduct and APS's inaction on the issue.

120. Wilson's baseless criticisms of McEachern-Anthony, removal of her job duties, and arbitrary rules limiting McEachern-Anthony's movements were in retaliation for McEachern-Anthony's protected activity.

121. After McEachern-Anthony found an opportunity to escape from Wilson by taking the position at Toomer, APS instituted an investigation to find pretext for McEachern-Anthony's termination—namely, the McEachern-Anthony's alleged dishonesty with respect to her daughter's home address.

122. Therefore, APS's actions violated Title VII, which prohibits employers from taking adverse actions against employees because they report or oppose unlawful discrimination and sexual harassment in the workplace.

123. APS's actions in retaliating against McEachern-Anthony because of her protected activity were committed with deliberate intent to harm McEachern-Anthony and her federally protected rights or, alternatively, with reckless disregard for her rights to be free from retaliation for reporting and opposing discrimination and sexual harassment.

124. The effect of APS's above-mentioned conduct has been to deprive McEachern-Anthony of equal employment opportunities and benefits due to her.

125. The actions taken against McEachern-Anthony by APS have caused her to suffer both monetary and non-monetary damages.

126. As a direct and proximate result of APS's unlawful employment practices, McEachern-Anthony suffered injuries for which she is entitled to recover equitable relief and compensatory damages, including economic losses and emotional distress, attorney's fees, and costs of litigation in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and that the following relief be granted:

a) Grant McEachern-Anthony a judgment in her favor against APS under all counts of this Complaint;

b) Order APS to make McEachern-Anthony whole by providing for her out-of-pocket losses as well as back pay in an amount equal to the sum of any wages, salary, employment benefits or other compensation denied or lost as a result of APS's unlawful and discriminatory acts, together with interest thereon, all in an amount to be proven at trial;

c) Order that McEachern-Anthony be awarded front pay;

d) Order APS to compensate McEachern-Anthony for garden variety emotional damages suffered as a result of APS's unlawful and discriminatory acts;

e) Award McEachern-Anthony pre- and post-judgment interest at the maximum rates allowable by law;

f) Grant to McEachern-Anthony her reasonable attorney's fees and reasonable expert witness fees together with any and all other costs associated with this action;

g) Grant McEachern-Anthony a jury trial on all issues so triable; and

h) Grant such additional monetary and equitable relief as the Court deems proper and just.

Respectfully submitted this 17th day of March 2026.

LEGARE, ATTWOOD & RAGAN, LLC

*/s/ Eleanor Mixon Attwood*
Eleanor Mixon Attwood
Georgia Bar No. 514014
David J. French
Georgia Bar No. 410443
emattwood@law-llc.com
djfrench@law-llc.com

Decatur Town Center Two
125 Clairemont Avenue, Suite 515
Decatur, Georgia 30030
Tel: (470) 823-4000
Fax: (470) 201-1212

*Counsel for Plaintiff*